**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 20 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JAIME ENRIQUEZ,

    Defendant - Appellant.

No. 04-2139
(D. New Mexico)
(D.Ct. No. CR-00-1610-LH)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1.9(G). The case is therefore ordered submitted without oral argument.

Defendant Jaime Enriquez appeals his conviction for conspiracy to distribute 100 kilograms and more of marijuana in violation of 21 U.S.C. § 846,

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

claiming the jury's verdict is not supported by sufficient evidence. We exercise

jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. Background

Agent Israel Barrera worked as an undercover narcotics officer for the

Border Operations Task Force of the Bureau of Immigration and Customs

Enforcement in New Mexico. In February 2000, a confidential informant

contacted Barrera and told him a person named Memmo Anaya was looking for

assistance in smuggling marijuana from Mexico to New Mexico. On March 3,

2000, the informant told Barrera that Anaya had a load of marijuana he wanted to

move between March 5 and March 7. On March 7, 2000, Barrera met with the

informant and Anaya, guised as a local sheriff, at a truck stop in Roadforks, New

Mexico, to discuss transporting the marijuana through a remote desert area of

southwestern New Mexico known as the "bootheel" and into Arizona. Barrera

agreed to escort the load through the bootheel and to provide a diversion if the

driver encountered law enforcement.

On March 8, 2000, the informant called Barrera telling him to meet the

informant and Anaya at the truck stop in Roadforks. While meeting with them,

Barrera saw two men arrive in a red pickup truck,[1] one of whom was later

identified as Enriquez. Anaya spoke with the men and then instructed Barrera to

_____

[1]This was not the same truck eventually used to transport the marijuana.

-2-

show them his badge as proof he was really a police officer. As the men left, Anaya told Barrera that the two men were happy with Anaya and would allow him to lead the operation. Anaya then told Barrera the delivery would be made the next day, March 9, 2000.

In the meantime, Leticia Torres-Drewel (Torres), a resident of Benson, Arizona, contacted a relative in Mexico to procure money for an eye operation for her mother. She was told she could earn money if she would drive a truck with fence making supplies from New Mexico to Arizona. She agreed to do it and was instructed to be in Douglas, Arizona, on March 9, 2000, and to wait at a convenience store for a relative's friend who would bring the truck. Torres informed her relative she would be driving a white convertible Chrysler Le Baron.

Torres followed her relative's instructions and, with her mother, waited at the convenience store. As planned, two men arrived in a red pickup truck with a gooseneck trailer. One of the men told her to follow them to the Motor Vehicle Department to register the trailer. At trial, Torres tenuously identified one of the men as Enriquez. It is uncontested that on March 9, Enriquez registered the trailer in his own name and received a temporary tag. The men then told Torres and her mother to follow them toward Rodeo, New Mexico. Once there, the women exchanged vehicles with the men. Torres was instructed to drive the truck and trailer to a café in Animas, New Mexico, while the men drove Torres' Le

Baron to Roadforks.

When Barrera arrived at Roadforks on March 9, he saw Anaya talking with Enriquez, who was leaning on the Le Baron in the parking lot. Anaya then told Barrera that the truck and trailer were in Animas, located in the middle of the bootheel, and they were to meet the drivers there. Anaya, Barrera and the informant, who was also at Roadforks, drove to Animas where Torres and her mother were waiting in the truck. Anaya asked Barrera to assist the women in locating the backpackers bringing in the shipment because they did not know the area. Barrera agreed. However, when the three were unable to find the correct location for the delivery in the bootheel's back country, they headed back to Animas where they met with Anaya and the informant. Torres and her mother then drove the truck to Roadforks and checked in at the motel. Barrera, Anaya and the informant also drove back to Roadforks.

When Barrera arrived in Roadforks, Anaya told Barrera to go inside the truck stop and wait. While inside, the informant told Barrera that Anaya was meeting with "the bosses" in the parking lot. Looking out a window from the game room, Barrera saw Anaya speaking with Enriquez and two other men in a silver car. Anaya finished speaking with the men and came into the game room. Anaya asked Barrera if he would be willing to attempt the pickup the next day. Barrera agreed but told Anaya that the two women driving the truck looked

-4-

suspicious and that he would rather do the pickup alone. Anaya agreed to pay Barrera an extra $2,000.00 to drive the truck to the pickup location and return to Roadforks. That night, Enriquez also checked in at the motel in Roadforks.

Barrera returned to Roadforks the next morning and took the truck and trailer to Animas by himself. Anaya and the informant traveled in another car. Meanwhile, Torres and her mother waited at the Roadforks restaurant. In Animas, Barrera received specific direction from Anaya about where to meet the backpackers moving the marijuana. Barrera eventually found the correct location and watched while the backpackers loaded the marijuana in a hidden compartment in the bottom of the trailer. Barrera then returned to Animas where he followed Anaya and the informant back to Roadforks. Barrera was dismissed and Torres and her mother drove the truck and trailer onto the freeway. As Barrera was backing his car out of his parking space, he saw Enriquez walk out of the truck stop and towards the Le Baron. However, Barrera did not actually see Enriquez enter the car.

Torres understood the Le Baron would follow her to Tucson, Arizona, and that it would then pull in front and show her where to drop the truck and trailer. Throughout these activities, narcotics agents remained in contact with Barrera. After learning that Barrera had delivered the truck and loaded trailer, surveillance agents followed the truck and observed the Le Baron maintaining a position

behind them. Eventually, Arizona law enforcement agents stopped the truck for a traffic violation. Torres consented to a search and the marijuana was discovered in the trailer's hidden compartment. A few days later, Torres, who had been released from custody, recovered her Le Baron at her uncle's house in Mexico.

On December 22, 2000, Enriquez and Torres[2] were charged in a two count indictment with conspiracy to possess with intent to distribute more than 100 kilograms and more of marijuana (Count I) and possession with intent to distribute 100 kilograms and more of marijuana (Count II). Enriquez' case was tried before a jury on January 20-22, 2004. On January 21, at the close of the government's case, Enriquez moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. The court took the motion under advisement and reserved ruling. The defense presented its case, calling Enriquez as a witness.

On January 22, 2004, the jury returned a guilty verdict on Count One—conspiracy—but was unable to reach a unanimous verdict on Count Two—possession. The parties agreed to a partial verdict and on June 1, 2004, the court declared a mistrial as to Count II, reserving the right of the government to re-try Enriquez on Count II. On the same day the court also issued a Memorandum

---

[2]Torres entered a plea of guilty on August 11, 2003, and testified for the government at trial.

-6-

Opinion and Order denying Enriquez' motion for judgment of acquittal and sentenced him to sixty three months imprisonment. Enriquez now appeals his conviction claiming the government presented insufficient evidence to support a finding of guilt beyond a reasonable doubt.

## II. **Discussion**

"We review the record *de novo* when reviewing both the sufficiency of the evidence to support a conviction and the denial of a motion for judgment of acquittal." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004); *United States v. Vallo,* 238 F.3d 1242, 1246-47 (10th Cir. 2001). We view the evidence in the light most favorable to the government. *United States v. Owen*, 15 F.3d 1528, 1532 (10th Cir. 1994). We do not weigh conflicting evidence or evaluate witness credibility; these are the exclusive province of the jury. *United States v. Castorena-Jaime*, 285 F.3d 916, 933 (10th Cir. 2002). Thus, "viewing the evidence in the light most favorable to the Government," we must determine whether "any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *Delgado-Uribe*, 363 F.3d at 1081 (internal quotation omitted).

If the court denies a defendant's motion for judgment of acquittal at the end

of the government's case-in chief,[3] the defendant may rest his case or proceed and present his evidence. *Id.* at 1082. "If a defendant chooses to rest his case, our review of the record is necessarily limited to evidence produced during the Government's case-in-chief alone." *Id.* If he "chooses to present additional evidence, however, [he] *waives* the right to have the sufficiency of the evidence tested by the government's case alone and we review the entire record on appeal." *Id.*, quoting *United States v. Bowie,* 892 F.2d 1494, 1496 (10th Cir.1990). *See also United States v. Lazcano- Villalobos,* 175 F.3d 838, 844 n.3 (10th Cir.1999). Because Enriquez chose to present evidence, we review the entire record to "determine whether the evidence and all reasonable inferences drawn therefrom could allow a reasonable jury to find [Enriquez] guilty beyond a reasonable doubt." *United States v. Munro*, 394 F.3d 865, 869 (10th Cir.), *cert. denied*, __ U.S. __, 2005 WL 717191 (2005).

The elements of conspiracy are well-settled. Under 21 U.S.C. § 846, "[t]he government must prove beyond a reasonable doubt: (1) an agreement with

---

[3]Rule 29(a) of the Federal Rules of Criminal Procedure provides:
After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *United States v. Dozal,* 173 F.3d 787, 797 (10th Cir. 1999) (internal quotations omitted). Enriquez argues the government failed to present sufficient evidence establishing an agreement to transport marijuana between him and any other person. In support, he relies on the fact that there was no witness who testified at trial as to the existence of an agreement between Enriquez and any other co-conspirator. We are not persuaded.

An agreement may be inferred from circumstantial evidence that indicates concerted action. *United States v. Jones,* 44 F.3d 860, 865 (10th Cir. 1995). To be reasonable, however, the inference of an agreement must be more than mere speculation or conjecture. *Id.* In reviewing the inferences supporting the jury's verdict, we may consider, *inter alia*: (1) a defendant's presence at the crime scene; (2) a defendant's association with co-conspirators; (3) evidence of conflicting stories; (4) active attempts to divert officers' attention from a stopped vehicle; (5) participation in drug transactions; or (6) knowledge of and control over drugs. *See id.* at 868-69. Any single factor, standing alone, may be insufficient to support an inference of a conspiracy. *See United States v. Riggins,* 15 F.3d 992, 994 (10th Cir. 1994). A direct correlation exists, however, between the number of circumstantial facts and the existence of a conspiracy. *See Jones,* 44 F.3d at

868-69.

### III. Conclusion

The evidence sufficiently establishes a reasonable inference of Enriquez' involvement in the conspiracy. He was certainly present at the crime scene. He arrived the day before the truck and trailer appeared, meeting with Anaya (the admitted organizer of the smuggling scheme) in the parking lot at Roadforks. Barrera testified he flashed his badge to Enriquez. The next day Enriquez appeared in Douglas, Arizona, with a trailer equipped with a hidden compartment, registered the trailer in his name, had the women follow him, and then traded vehicles with directions for them to drive to the Animas café—the place where the women eventually meet with Barrera to search for the marijuana. Thereafter, Enriquez remained at the scene, driving Torres' Le Baron to Roadforks where Barrera again saw him, this time in conference with the "bosses." (Tr. at 46.) Enriquez checked in at the motel, stayed the night and did not leave until Barrera returned with the loaded trailer. Barrera saw Enriquez walk toward the Le Baron after the delivery, and only then did Enriquez vanish. A reasonable juror could conclude that Enriquez' control and registration of the trailer, his continued presence throughout the three days' activities and his meetings with the other smugglers at critical times sufficiently establish beyond a reasonable doubt his agreement with the others, his knowledge of the objective, his voluntary

participation in the illegal activity and an interdependence between the conspirators. Enriquez' conviction is AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge